# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Asylum Seeker Advocacy Project; Central American Resource Center – Los Angeles; Immigrant Defenders Law Center; and Public Counsel,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>William Barr, Attorney General; James McHenry, Director, Executive Office for Immigration Review; Kevin McAleenan, Secretary, Homeland Security; Mark Morgan, Acting Director, U.S. Immigration and Customs Enforcement; and Thomas R. Decker, Field Office Director, New York Field Office, U.S. Immigration and Customs Enforcement,<br><br>　　　　　Defendants. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: July 11, 2019
　　　New York, NY

## <u>INTRODUCTION</u>

1.　　Plaintiffs are several organizations that serve immigrant families and children who fled persecution or torture in their home countries. They seek to prevent imminent deportations in violation of the most basic due process principles: the rights to notice and an opportunity to be heard. The families and children whom Plaintiffs serve fled their countries within the last five years. But none of them ever had their claims for asylum and related relief

heard by an immigration judge. Instead, the government ordered them removed *in absentia* because they failed to appear in court.

2.      Upon information and belief, the Trump Administration will soon arrest en masse thousands of these families and children – most of them from El Salvador, Guatemala, and Honduras. Specifically, Mark Morgan, Acting Director of ICE, announced on June 19, 2019 that the upcoming mass arrests would include among its targets 2,000 families who recently arrived and were ordered deported *in absentia*.

3.      The *in absentia* removal orders the Trump Administration now seeks to enforce were not properly entered because the government's system for providing notice is in chaos. In thousands of cases, the government mailed notices to incorrect addresses; sent them with no date or time; and set hearings for dates – including weekends – when no hearings were being held at all.

4.      Even when the government sent notices to the right address for a real hearing, it repeatedly sent them too late, for locations unreasonably far from immigrants' homes. Notices thus arrived either *after* the date set for a hearing or just a few days before, requiring indigent families to immediately travel across the country to hearings in distant states.

5.      The government also entered thousands of *in absentia* orders against children, even though those children obviously had no control over whether they appeared in court.

6.      Defendants will contend that any individual improperly ordered removed *in absentia* can and must file a written "motion to reopen" to establish their removal order was entered in error. But that procedure is effectively unavailable for unrepresented families and children. Such individuals are unable to write in English a document satisfying the complex procedural requirements applicable to motions to reopen.

7.      The unrepresented families and children ordered removed *in absentia* through these deficient procedures did not receive proper notice, are unable to file a motion to reopen, and could suffer serious harm if deported. The Due Process Clause and the refugee protection laws therefore require that these individuals have an opportunity, before they are deported, to

appear before an immigration judge, where the judge can speak to them to determine whether rescission of their order is warranted.

8.      Unless this Court enforces that requirement, thousands of individuals could be deported without ever receiving a fair opportunity to appear before a judge, as required by the Due Process Clause and the immigration laws.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331, which confers jurisdiction to consider federal questions.[1]

10.     This Court may grant relief under 28 U.S.C. 1331 (federal question), 28 U.S.C. 1651 (All Writs Act), 5 U.S.C. 702 and 706 (Administrative Procedure Act), 28 U.S.C. 2201 and 2202 (Declaratory Judgment Act), and Fed. R. Civ. P. 65 (injunctive relief). Defendants do not have sovereign immunity for claims seeking injunctive relief for constitutional violations, *see Ex Parte Young*, 209 U.S. 123 (1908). In any event, the government has waived any such immunity. 5 U.S.C. 702.

11.     Venue is proper in the Southern District of New York under 28 U.S.C. 1391 because Defendants are officers or employees of the United States and a Plaintiff resides in this District, *see* 28 U.S.C. 1391(e)(1)(C); because a substantial part of the events giving rise to the claims in this action took place in this District, *see* 28 U.S.C. 1391(e)(1)(B); and because a Defendant resides in this District, *see* 28 U.S.C. 1391(e)(1)(A).[2]

---

[1] The Due Process Clause and Article III of the U.S. Constitution also require some federal forum for judicial review of federal statutory and constitutional claims like those at issue here.
[2] The Transactional Records Access Clearinghouse (TRAC) at Syracuse University obtains data on various aspects of the immigration court process from the Executive Office of Immigration Review. Based on its analysis, more than 5,000 unrepresented children have been ordered deported *in absentia* in New York since 2014. *See* Transactional Records Access Clearinghouse Immigration, *Juveniles – Immigration Court Deportation Proceedings* (last visited July 9, 2019), https://trac.syr.edu/phptools/immigration/juvenile/. While data about family units from the last two years is limited, more than 800 unrepresented people in family units were ordered removed *in absentia* in New York from fiscal years 2014 to 2017. *See* Transactional Records Access Clearinghouse Immigration, *Priority Immigration Court Cases: Women With Children* (last visited July 9, 2019), https://trac.syr.edu/phptools/immigration/mwc/.

## PARTIES

12.     The Asylum Seeker Advocacy Project ("ASAP") was founded in 2015 and has been fiscally sponsored by the Urban Justice Center, a 501(c)(3) nonprofit organization. It is incorporated in New York and its office is located in New York City (within the Southern District).

13.     ASAP aims to prevent the wrongful deportation of families seeking asylum and otherwise vindicate their rights. To achieve this goal, ASAP provides legal representation and related forms of assistance to individuals who have sought asylum at the Mexico-U.S. border, regardless of where they are currently located.

14.     ASAP's work has focused on serving families who have little or no access to traditional legal service providers, including in rural places and less resourced states. Most of ASAP's clients thus far have been individuals whom the government initially detained in border detention centers.

15.     ASAP attorneys and support staff typically work remotely to represent asylum-seeking families who are facing deportation.

16.     CARECEN-Los Angeles (hereinafter "CARECEN") was founded in 1986 to address the needs of Salvadorans and other Central Americans who fled the region amid the civil wars, political repression, and counter-insurgencies of the 1980s. CARECEN focuses on providing immigration legal services and advocacy and also seeks to advance health and wellness and family support for immigrants. Its mission is to provide direct services and engage in community development and advocacy to help create a thriving Latino immigrant community.

17.     CARECEN's attorneys have provided, *inter alia*, free legal assistance to immigrants, including to immigrants subject to *in absentia* removal orders, and have filed motions to reopen on behalf of such immigrants. CARECEN offers immigrant communities free know-your-rights training, addressing*, inter alia*, removal proceedings, *in absentia* orders, and motions to reopen. CARECEN also engages in community development and advocacy regarding immigration issues.

18.     Immigrant Defenders Law Center ("ImmDef"), founded in 2015, is one of the largest nonprofit providers of deportation defense in California. ImmDef's mission is to provide access to counsel to all indigent immigrants in deportation proceedings and defend immigrant communities from systemic injustices within the legal system. ImmDef focuses on representing the most vulnerable populations in removal proceedings, including unaccompanied children and youth who arrive alone in the United States and face deportation, adults with mental-health challenges, and lawful permanent residents facing deportation due to unlawful conviction.

19.     ImmDef attorneys have provided, *inter alia*, free legal assistance to immigrant children, including to immigrants subject to *in absentia* removal orders, and have filed motions to reopen on their behalf. Through its Detained Youth Empowerment Project, which provides know-your-rights classes and legal screenings for all children detained in shelters in the greater Los Angeles area, ImmDef also works to educate children about the immigration system. ImmDef engages in advocacy with lawmakers at the local, state, and federal level, with the goal of furthering universal representation and establishing a public-defender system for immigrants.

20.     Public Counsel was founded in 1970 and is the largest pro bono law firm in the nation. Its activities are far-ranging and affect a wide spectrum of people who live at or below the poverty line. Public Counsel's mission is, in part, to protect the legal rights of disadvantaged children; to represent immigrants who have been the victims of torture, persecution, domestic violence, trafficking, and other crimes; and to foster economic justice by providing individuals and institutions in underserved communities with access to quality legal representation.

21.     Public Counsel's attorneys have provided, *inter alia*, free legal assistance to immigrants in removal proceedings, including immigrants subject to *in absentia* removal orders, and have filed motions to reopen on behalf of such immigrants.

22.     Public Counsel also participates in coalitions that seek to influence immigration policy. For instance, in 2015, Public Counsel was a signatory on a letter to President Barack Obama opposing reported DHS plans to conduct immigration raids to round up and deport Central American children and their parents.

23.     Defendant William Barr is the Attorney General of the United States, the most senior official in the U.S. Department of Justice ("DOJ"). He has the authority to interpret the immigration laws and adjudicate removal cases. The Attorney General delegates this responsibility to the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals ("BIA"). He is named in his official capacity.

24.     Defendant James McHenry is the Director of EOIR, the agency within DOJ responsible for the immigration courts and the BIA. He is named in his official capacity.

25.     Defendant Kevin McAleenan is the Acting Secretary of the U.S. Department of Homeland Security ("DHS"), an agency of the United States. He is named in his official capacity.

26.     Defendant Mark Morgan is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). ICE is responsible for the apprehension, detention, and removal of noncitizens from the United States. He is named in his official capacity.

27.     Defendant Thomas R. Decker is the Director of the New York Field Office for ICE, a component of DHS. Mr. Decker has custody of immigrants subject to *in absentia* orders after their apprehension within the jurisdiction of the New York Field Office. He is named in his official capacity.

## FACTUAL BACKGROUND

**Families and Children Fleeing Violence**

28.     The number of people fleeing persecution who sought refuge in the United States began to increase significantly in 2014. In particular, a large number of people began to flee violence in El Salvador, Honduras and Guatemala. Between 2015 and 2017, the number of people from those countries requesting asylum in the immigration courts increased 258%. The

number decreased somewhat in 2018, but early evidence suggests the number of people fleeing those countries has increased again in 2019.[3]

29.     Since 2014, a significant percentage of people fleeing persecution have come either as families or as unaccompanied children.[4] The percentage of all those apprehended at the Southwest border who arrived as families or unaccompanied children increased from 10% of the total number of individuals in 2012, to 66% in the period from October 2018 to May 2019.[5] A total of 65,691 adults and children had their cases processed as "family unit" cases between September 2018 and May 2019 in ten immigration court locations (while other families did not have their cases processed as "family units").[6]

30.     Many of the families and unaccompanied children who have sought refuge here fled persecution, torture, or death at the hands of their governments, transnational gangs, or their own family members. Many migrant children have also been raped, kidnapped, abandoned, or physically abused in their home countries or by smugglers during their journey to the United States.

---

[3] Miriam Jordan, *More Migrants Are Crossing the Border This Year. What's Changed?* New York Times (March 5, 2019) (268,044 migrants detained in the first five months of this fiscal year, including 136,150 people arriving in families with children).

[4] For purposes of this complaint, "families" refers to individuals who were part of a family unit at the time of their apprehension or when their cases were processed by the immigration courts. "Unaccompanied children" or "children" similarly refers to people under 18 who were unaccompanied by their parents at the time of their apprehension or when their cases were processed.

[5] U.S. Customs and Border Protection, Southwest Border Migration, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited June 19, 2019). Adam Isacson, et al., There is a Crisis at the U.S.-Mexico Border. But It's Manageable, Washington Office on Latin America, April 4, 2019, https://www.wola.org/analysis/fix-us-mexico-border-humanitarian-crisis/ (last visited June 19, 2019).

[6] Transactional Records Access Clearinghouse Immigration, *Most Released Families Attend Immigration Court Hearings* (June 18, 2019) https://trac.syr.edu/immigration/reports/562/. Memorandum from James R. McHenry, *Track and Expedition of "Family Unit" Cases* 1 (Nov. 16, 2018), https://www.justice.gov/eoir/page/file/1112036/download (Family unit cases started to be tracked in ten immigration court locations: Atlanta, Baltimore, Chicago, Houston, Los Angeles, Miami, New Orleans, New York City, San Francisco).

**The "Rocket Docket" Causes Widespread Notice Failures and Other Due Process Problems.**

31.      In response to the increase in families and children fleeing their countries of origin, since 2014 the government has consistently processed the deportation cases of these families and children on an extremely expedited basis, in a chaotic and disorganized manner. Massive errors in the implementation of these so-called "rocket dockets" have resulted in widespread failures to provide adequate notice in thousands of cases. Many of these errors were likely accidental, but others were at least reckless and in some cases intentional.

32.      In the summer of 2014, the Obama Administration "prioritized" the deportation cases of families and children seeking asylum for expedited processing in the immigration court system. Immigration courts shifted their resources and altered their case management practices to resolve these deportation cases swiftly by creating rocket dockets to adjudicate them quickly.[7] High-level administration officials endorsed this plan and also signaled their intention to deport the families and children subject to the rocket dockets. As then-Vice President Joe Biden stated, "the Department of Justice, Homeland Security . . . are enhancing the enforcement and removal proceedings because those who are pondering risking their lives to reach the United States should be aware of what awaits them. It will not be open arms. . . . [W]e're going to send the vast majority of you back." Press Release, Vice President Joe Biden, Office of the Vice President, Remarks to the Press with Q&A in Guatemala (Jun. 20, 2014).

33.      From the outset, the rocket dockets produced widespread notice failures. For example, Plaintiffs and other legal service providers saw instances of immigrant families and children receiving hearing notices fewer than 10 days before their hearing date, contrary to the requirements of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1229(b)(1), and in many instances *after* the scheduled hearing. In other instances people never received notices because

---

[7] *See* Press Release, U.S. Department of Justice, Department of Justice Announces New Priorities to Address Surge of Migrants Crossing into the U.S. (Jul. 9, 2014); *see also* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges (Sept. 10, 2014).

court staff incorrectly entered addresses or because, for other reasons, the addresses on file with EOIR did not match the addresses provided to the government by immigrants or their sponsors.[8] In either case, the result was that notices were sent to the wrong addresses through no fault of the immigrants.

34.     When thousands of unrepresented families failed to appear for their immigration court hearings, immigration judges consistently ordered them removed *in absentia*. The courts entered the *in absentia* removal orders in such cases against all the family members in such proceedings, including the children.

35.     Similarly, when thousands of unrepresented unaccompanied children failed to appear for their hearings, the judges consistently ordered them removed. They did so despite the fact that—whether or not the adults involved had received proper notice—the children themselves had no control over whether or not they appeared in court.

36.     The severity of these early problems caused by the rocket docket led dozens of legal-service providers to write the Obama Administration in February 2015, asking that it fix those problems: "Legal service providers, social service providers, and immigration advocates that work with children in removal proceedings have received numerous reports . . . of significant numbers of children who have either received defective notice of their removal

---

[8] *See* Kate Linthicum, *7,000 Immigrant Children Ordered Deported Without Going to Court*, L.A. Times (Mar. 6, 2015) (finding that notices sometimes arrived late, at the wrong address, or not at all; or that they arrived very shortly before the hearing date but required children to travel hundreds of miles to attend their court hearings), http://www.latimes.com/local/california/la-me-children-deported-20150306-story.html; *see also* Tom Jawetz, *Addressing the Flow of Central American Mothers and Children Seeking Protection*, Center for American Progress (Jan. 12, 2016) (finding that the Obama Administration's raids targeting families and children from Central America posed a serious "due process crisis" because the government often failed to provide "accurate and sufficient notice regarding scheduled court hearings"), https://www.americanprogress.org/issues/immigration/news/2016/01/12/128645/addressing-the-flow-of-central-american-mothers-and-children-seeking-protection/; *see also* Philip E. Wolgin, *Ensuring Due Process Protections for Central American Refugees*, Center for American Progress (Feb. 1, 2016) (evidence suggests unaccompanied children were inadequately informed of future hearing dates), https://www.americanprogress.org/issues/immigration/news/2016/02/01/130294/ensuring-due-process-protections-for-central-american-refugees/.

proceedings and upcoming hearing dates, or who have not received notice at all. Yet immigration courts have issued and continue to issue numerous *in absentia* removal orders against such children, including those without legal representation." *See* Letter of February 9, 2015 from American Friends Service Committee, et al., to Juan Osuna, et al. (attached as Exhibit A).[9]

37.     Despite this letter and other efforts to bring these issues to the attention of the government, the problems with defective notices continued. Although the government modified the expedited processing system in March 2015, the modifications had no effect on either the excessive speed with which cases were scheduled or the immigration judges' practice of ordering that those who did not appear be removed.

38.     The Trump Administration's policies and practices have severely exacerbated these problems. The Trump Administration adopted its own version of the rocket dockets, resulting in predictable chaos. In January 2017, the Executive Office for Immigration Review set new case priorities revising docketing practices. Among those designated as the highest processing priority were unaccompanied children in government custody.

39.     The following year, the Trump Administration instructed that cases of family units would be docketed expeditiously as well, so that they could be processed within one year. Although the Administration acknowledged that the previous family unit processing priority had failed, it asserted its new policy targeting family units would succeed.

40.     Thus, chaotic docketing practices have continued unabated in the last two years, resulting in the same or worse notice problems. For example, in 2018, ICE knowingly issued thousands of Notices to Appear for dates on which immigration courts had not actually scheduled hearings. In some cases these purported notices listed weekend dates, or dates that do not exist, such as September 31. In hundreds of cases, applicants arrived for hearings to find long lines, only to learn that they were not in fact scheduled for a hearing on that day.

---

[9] This letter traced the beginning of these problems to a charging practice that apparently began around May 24, 2014. A similar letter written by the New York Civil Liberties Union to the Chief Immigration Judge in New York suggested it could have begun as early as May 1, 2014. (attached as Exhibit B).

41.     In other cases, immigration enforcement officials served the Notice to Appear in person or at the correct address, but did not file it in court until long afterward. Individuals whose addresses changed after receiving such Notices to Appear had no mechanism to change their address with the immigration courts while awaiting their hearing date, because their cases were not yet in the court system.

42.     Other notices were sent with no date and time, or in other cases with no location. The government had itself argued in briefing to the Supreme Court that the immigration statute does not permit courts to order that an individual to be ordered removed *in absentia* on the basis of a Notice to Appear issued without a date and time, *Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018) (citing 8 U.S.C. 1229a(b)(5)(A) and (b)(5)(C)(ii)), but immigration judges issued thousands of such *in absentia* orders anyway.

43.     As of the end of May 2019, a detailed analysis of court records found nearly 10,000 "phantom" family cases, meaning that the record contained a case number but did not include the date of the Notice to Appear, its filing date, the charges alleged, or any further details about the family. In other cases, court records left address fields blank, or the addresses contained transcription errors, such as ZIP codes that did not exist or that corresponded to a city different from the one listed. Overall, in 83% of the cases decided *in absentia*, not even the initial scheduling hearing ever took place.[10]

44.     A different analysis conducted by the Department of Justice itself focused on one immigration court. Based on this analysis, the department admitted that court staff failed to process or send out many change-of-address forms: "Poor management of this core process . . . can result in respondents being ordered removed in absentia through no fault of their own."[11]

45.     At the same time that the Trump Administration failed to provide proper notice in thousands of cases, the Attorney General directed immigration judges to grant fewer

---

[10] Transactional Records Access Clearinghouse Immigration, *Most Released Families Attend Immigration Court Hearings* (June 18, 2019) https://trac.syr.edu/immigration/reports/562/.

[11] Ani Ucar, *Leaked Report Shows the Utter Dysfunction of Baltimore's Immigration Court,* VICE NEWS, Oct. 3, 2018, https://news.vice.com/en_us/article/xw94ea/leaked-report-shows-the-utter-dysfunction-of-baltimores-immigration-court (last visited June 21, 2019).

continuances. *Matter of L-A-B-R-*, 27 I. & N. Dec. 245 (2018). EOIR also implemented

performance metrics for immigration judges, requiring them to complete 700 cases per year.

These measures exacerbated the pressure on already overburdened immigration judges to resolve

cases very quickly, thereby increasing the number of unjustified *in absentia* orders.

46.    As a result, for the last five years, immigration judges have issued *in absentia*

removal orders for tens of thousands of unrepresented families and children who never had a fair

opportunity to appear in court.[12]

47.    From fiscal years 2014 to 2017, 35,461 unrepresented "adults with children" (*i.e.*,

families) and 39,027 unrepresented "unaccompanied children" were ordered removed *in absentia*

under the Obama-era rocket dockets. Nearly 90% of all removal orders entered against

unrepresented families during that period were *in absentia* orders. Similarly, about 90% of the

removal orders against unrepresented children during that period were entered *in absentia*.[13]

---

[12] Manuel Madrid, *Miami's Immigration Court Has Become a Well-Oiled Deportation Machine, New Data Shows*, Miami New Times, June 27, 2019, https://www.miaminewtimes.com/news/miamis-immigration-court-issues-deportation-orders-for-thousands-of-families-11204731?fbclid=IwAR0aPr8Z8xn_I953xORMEp28CG9zuKH6j1-nEeO9nJw0cQXfdjvDxaKZ8Cs (last visited July 2, 2019); *see also* Timothy Bella, *An 11-year-old girl could be deported because of a court error triggered by the government shutdown, attorney says*, The Washington Post, April 12, 2019, https://www.washingtonpost.com/nation/2019/04/12/i-dont-want-be-taken-away-my-mom-an-year-old-girl-could-be-deported-without-her-family/?utm_term=.df0d0075a719 (last visited June 19, 2019).

[13] Publicly available data from the "adults with children" docket covers the period from approximately the summer of 2014 through April 2017. Publicly available data for the "unaccompanied children" docket covers, *inter alia*, all of 2014, so the numbers cited above include some number of unrepresented children ordered removed *in absentia* before the government officially implemented the rocket docket in July 2014, as well as some number ordered removed *in absentia* after the docket officially stopped operating. *See* Transactional Records Access Clearinghouse Immigration, *Priority Immigration Court Cases: Women with Children* (last visited July 9, 2019) (approximately 88% of all removal orders against unrepresented "adults with children" on the "adults with children" docket were ordered removed *in absentia*), http://trac.syr.edu/phptools/immigration/mwc/; Transactional Records Access Clearinghouse Immigration, *Juveniles—Immigration Court Deportation Proceedings* (last visited July 9, 2019) (approximately 90% of all removal orders against unrepresented "juveniles" were *in absentia*), http://trac.syr.edu/phptools/immigration/juvenile/.

48.     Under the Trump Administration, Department of Justice statistics show that, as of June 2019, 12,784 "family units" have been ordered removed in its rocket dockets. 85% of those removal orders were entered *in absentia*.[14] Data on unaccompanied children is harder to obtain due to the effects of the Trump Administration's family-separation policy, but available data suggests nearly 30,000 unrepresented children have been ordered removed *in absentia* since 2018.[15]

49.     Thus, there are now tens of thousands of families and children living in the United States with *in absentia* removal orders who never had a fair opportunity to appear in court.

**In Absentia Orders and The Inadequacy of the Motion to Reopen Mechanism**

50.     The immigration statutes permit immigration judges to order individuals removed *in absentia* if they fail to appear, but only if the judge finds both that they received proper notice of the date and time of the hearing and are removable. 8 U.S.C. 1229(a)(1). *See also* 8 U.S.C. 1229(a)(2) (requiring additional notice where time or place of proceedings changes).

51.     At the removal hearing, DHS must establish "by clear, unequivocal, and convincing evidence" both that it complied with its notice obligations and that the non-citizen is removable. 8 U.S.C. 1229a(b)(5)(A); 8 C.F.R. 1003.26. Unlike in at least some other legal systems, however, written notice is considered sufficient not only if it is "provided to the alien or the alien's counsel of record," but also if it is provided at the non-citizen's most recent address on file. 8 U.S.C. 1229a(b)(5)(A). In other words, if a DHS prosecutor can show that the agency provided notice to that address, an Immigration Judge can proceed *in absentia*, whether or not the non-citizen ever received the notice or was actually even living there. Moreover, the agency treats removability as established by evidence that the non-citizen had no pre-existing authorization to enter or remain in the United States. DHS need not show ineligibility for asylum in order to establish removability.

---

[14] Executive Office for Immigration Review Adjudication Statistics: "Family Unit" Data for Select Courts (available at https://www.justice.gov/eoir/file/1174141/download).

[15] *See supra* n. 13 [[Transactional Records Access Clearinghouse Immigration, *Juveniles—Immigration Court Deportation Proceedings* (last visited July 9, 2017) https://trac.syr.edu/phptools/immigration/juvenile/.]]

52.     Nonetheless, the government treats an *in absentia* order as final and enforceable with no further process. When ICE enforcement officers encounter an individual with an *in absentia* order, they can arrest and deport that individual in a matter of days or even hours. Individuals ordered removed *in absentia* are provided no opportunity to appear before a judge, to appeal, or to any other process. Under current agency practice, the only way for an individual facing imminent deportation pursuant to an *in absentia* order to obtain relief from that order is to file a *written motion to reopen*. 8 C.F.R. 1003.23(b)(4)(ii).

53.     The statute permits rescission of *in absentia* orders if notice was defective, upon a showing of exceptional circumstances, or for certain other reasons. *See generally* 8 U.S.C. 1229a(b)(5)(c).[16] As noted above, however, the *only* mechanism the agency recognizes to permit someone to raise those arguments is for them to file a written motion.

54.     For *represented* individuals, this written motion can serve as an important mechanism for addressing the due process failures described above. Immigration judges routinely have granted motions to reopen filed by Plaintiffs and other legal-service providers for families and children they represent—based on notice failures, service defects, the immigrant's understandable inability to attend a hearing (including because he or she was a child at the time the removal order issued), and other common deficiencies. Many of these reopened proceedings have resulted in relief from deportation.

55.     For example, Plaintiff Asylum Seeker Advocacy Project (ASAP), along with Catholic Legal Immigration Network, Inc., won *all 46* of the cases in which they filed motions to reopen, the substantial majority without the need for any appeal. The top three reasons they found for their clients' failure to appear were (1) lack of any timely notice; (2) government errors

---

[16] Regulations and case law also recognize additional requirements for service in children's cases. Service of a notice to appear "shall be made upon the person with whom . . . the minor resides" and "whenever possible, service shall also be made on the near relative, guardian, committee, or friend." 8 C.F.R. 103.8(c)(2)(ii).

and omissions in the communication of notice information; and (3) physical, geographical, and language barriers that prevented the client from attending the hearing.[17]

56.     As these results show, a very high percentage of families and children ordered removed *in absentia* would have their motions to reopen granted, if they had the ability to present them.

57.     Immigrant families and children who do *not* receive legal assistance from Plaintiffs or other attorneys are, however, unable to file motions to reopen. Most of these immigrants subject to *in absentia* orders speak limited if any English, and they lack the capacity to read, understand, and comply with the requirements for writing and filing a motion to reopen.

58.     These requirements are extremely complex. The immigration statute recognizes three bases on which an immigration court can grant a motion to reopen an *in absentia* order. Non-citizens must demonstrate that they did not receive proper notice, that they were in federal or state custody and therefore failed to appear through no fault of their own, or that the non-appearance was due to "exceptional circumstances." 8 U.S.C. 1229a(b)(5)(C). "Exceptional circumstances" in this context is a term of art, which refers to circumstances "beyond the control" of the immigrant, such as "battery or extreme cruelty" to the immigrant, "serious illness" of the immigrant, or "serious illness or death of the spouse, child, or parent," but not "less compelling circumstances." 8 U.S.C. 1229a(e)(1); *see also* 8 C.F.R. 1003.23(b)(iii)(A)(1). The deadline for filing a motion to reopen differs based on the claim being raised. There is no deadline for filing a motion to reopen based on alleged notice defects. 8 U.S.C. 1229a(b)(5)(C)(ii). A motion based on exceptional circumstances must be filed within 180 days of the removal order, though that deadline is subject to tolling. 8 U.S.C. 1229a(b)(5)(C)(i). The statute and BIA caselaw also recognize other bases for filing motions to reopen. *See, e.g.*, 8 U.S.C. 1229a(c)(7)(C)(ii) (changed country conditions).

---

[17] Asylum Seeker Advocacy Project and the Catholic Legal Immigration Network, Inc., *Denied a Day in Court: The Government's Use of In Absentia Removal Orders Against Families Seeking Asylum* (2018). At the time of publication, two of the 46 cases had not been granted, but since publication the motions in those two cases were also granted.

59.     In addition, an individual seeking to file a motion to reopen an *in absentia* removal order must generally review their immigration file (known as the "A-file" or, for court records, the "Record of Proceedings") to determine what the record discloses regarding the government's attempt to provide notice. The government does not, however, provide individuals with a copy of their A-file and Record of Proceedings at the time they are arrested pending deportation.

60.     Under current agency practice, the government does not permit individuals to make their motions to reopen orally before an immigration judge. Moreover, the government does not provide individuals with access to their A-files (the file containing all government documents related to their case) to prepare such motions. Indeed, it takes no steps to assist individuals who lack the capacity to file on their own, even once they are detained pending deportation. For these reasons, the motion-to-reopen process does not provide unrepresented individuals facing imminent removal any meaningful opportunity to challenge defects in their *in absentia* removal orders prior to deportation.

**Plaintiffs' Attempts to Protect Immigrant Families and Children**

61.     Plaintiffs provide legal representation to many families and unaccompanied children. In addition, because the Plaintiff organizations lack the capacity to represent all (or even most) of the unrepresented families and children they encounter, they provide a range of lesser forms of legal assistance to many of the unrepresented families and children they serve.

62.     Plaintiffs have been, and will continue to be, harmed by the inadequacies of the current motion-to-reopen process for unrepresented individuals. Those deficiencies force them to divert resources away from their core services, thereby undermining their missions and impairing their activities. Each time raids against immigrants with existing *in absentia* orders occur, this harm is multiplied, as some or all Plaintiffs expend resources trying to identify the affected individuals and, if possible, assist them in filing motions to reopen or otherwise countering the defects in the motion-to-reopen process. Plaintiffs have also expended resources on community

educational programs explaining *in absentia* removal orders and the risks they create and on advocacy to ameliorate the harsh effects of the rocket dockets.

63.     In addition, the immediate deportation without a hearing of individuals with *in absentia* orders, including those Plaintiffs seek to serve, prevents those individuals from gaining access to the organizations' core services. Although Plaintiffs assist individuals facing deportation with prior *in absentia* orders to the extent possible, they are not able to help all of their constituents in such circumstances.

64.     As described above, Plaintiff Asylum Seeker Advocacy Project (ASAP) has focused its work on protecting families seeking asylum who face wrongful deportation.

65.     Although ASAP's key mission is to assist families in obtaining asylum, a large portion of its limited representation resources have instead been spent litigating motions to reopen due to the constitutional deficiencies associated with *in absentia* orders. At the cost of not being able to provide its full complement of core services, ASAP has been forced to focus on challenging *in absentia* orders because of the high rate of *in absentia* orders among families who fled persecution and the particular risk of immediate unlawful deportation that individuals with such orders face. Perhaps most important, pro bono resources—volunteer legal work by private law firms and attorneys—are very often unavailable to people with *in absentia* orders, because the requirements for preparing and filing written motions to reopen are technically complex and the work involved is far more than for other cases, thereby making those cases less attractive to private pro bono attorneys who are not immigration specialists. As a result of these factors, a large portion of ASAP's direct representation has involved people who have been ordered removed *in absentia*.

66.     If ASAP had not been compelled to expend these resources on *in absentia* orders, it would have directed them toward providing assistance to pro se individuals to file their asylum applications in immigration court or litigate appeals, placing cases with private attorneys to litigate asylum hearings, and otherwise working to help people obtain asylum and other services

in aid of families' seeking refuge. Instead, however, it has had to spend an inordinate amount of time and resources reopening cases just for people to get the chance to apply.

67.     ASAP could conduct its work far more efficiently if the government were required to present individuals ordered removed *in absentia* to immigration judges, with an opportunity to move orally to reopen their cases, prior to executing the removal orders. Among other benefits, such a system often would obviate the need to prepare and file written motions. While in some cases such motions might still be required to supplement oral presentations, the number of them would be greatly reduced and they could be more narrowly focused on the specific issues that may have been identified in initial court proceedings. Such a system would also permit ASAP to concentrate on its mission by assisting individuals in their asylum cases in immigration court.

68.     Plaintiff CARECEN-LA runs multiple core programs dedicated to ensure the legal rights of Central American immigrants. Resources from each of those programs are diverted to addressing the problems arising from the enforcement of *in absentia* orders against Central American families.

69.     CARECEN-LA has a large community-education program to inform its constituents of the dangers arising from the immigration-enforcement system. That program utilizes "charlas"—community presentations convened at schools, consulates, CARECEN's offices, and elsewhere—that provide basic but critical information concerning the immigration system. Because of the acute risk created by the possibility of immediate deportation arising from *in absentia* orders, the staff conducting charlas routinely include extensive information on how someone can determine that they have an *in absentia* order, the risks associated with such orders, and basic information about the motion-to-reopen process.

70.     Through its charla programs, its office intake, and elsewhere, CARECEN-LA staff routinely encounter unrepresented individuals ordered removed *in absentia* on the rocket docket, including both families with children and children who came to this country alone. CARECEN-LA attorneys must work under intense time pressure to file motions to reopen in

such cases, forcing them to change their work priorities to focus first on *in absentia* cases at the expense of other, core services, because an individual who is arrested with a pre-existing *in absentia* order faces immediate deportation without the opportunity to appear before a judge. CARECEN staff are forced to work much more quickly than they otherwise would to contact the individual's family members on an expedited basis, attempt to obtain the relevant documents from the A-file through extraordinary channels, and file a motion to reopen on an expedited basis.

71.     Whenever there are increased enforcement actions against any particular population, such as Central American families and children who came in the last few years, CARECEN-LA's office receives a corresponding increase in intakes and requests for information. These increases inundate the organization's staff, thereby diverting them from performing other work.

72.     Thus, at the expense of fully pursuing its core goals, CARECEN has been compelled to devote significant portions of its limited resources to counteract the constitutionally insufficient process afforded immigrants subject to *in absentia* removal orders, for instance by undertaking additional legal representations, outreach efforts, and advocacy. If CARECEN had not been compelled to expend these resources, it would have directed them toward other efforts to advance immigrants' rights and other abuses in the immigration-enforcement system.

73.     In addition, funding for CARECEN's asylum cases is based in part on the number of cases it handles per year and the number it anticipates serving. Because individuals with *in absentia* orders face immediate deportation and require complex written motions to reopen just to get a hearing before a judge, CARECEN expends resources that could otherwise be devoted to multiple other cases when it takes on a single *in absentia* case. That inefficiency has harmed CARECEN's funding, because it reduces the total number of cases CARECEN can take on.

74.     Plaintiff Immigrant Defenders Law Center (ImmDef) also runs several programs dedicated to ensuring the legal rights of non-citizens facing deportation, including Central Americans fleeing persecution. ImmDef provides education to community members, including

members of the Central American refugee community, about the immigration-enforcement system. In that context, it must expend resources explaining *in absentia* removal orders and the particular dangers arising from them, thereby preventing it from addressing other important immigration-enforcement topics.

75.    ImmDef attorneys also provide educational programs for dependency attorneys, hospitals, and other social service providers who come into contact with non-citizens, including Central Americans who came here fleeing persecution. ImmDef's attorneys often must focus on the unique dangers associated with *in absentia* removal orders as part of those educational programs, thereby displacing content about other important immigration-enforcement topics.

76.    In addition, ImmDef attorneys provide legal assistance and representation to every detained child in the Los Angeles area, including the children detained in long-term foster care facilities and any children held in the custody of the Office of Refugee Resettlement. Because some of those clients are released and subsequently ordered removed for failing to appear, ImmDef has former clients with *in absentia* removal orders. When its staff encounters those individuals, they must work expeditiously to protect them because of the unique risk posed by the possibility of deportation without a hearing. The need to protect individuals with *in absentia* orders thus displaces other immigration defense work.

77.    Accordingly, at the expense of fully pursuing its core goals, ImmDef has been compelled to devote significant portions of its limited resources to counteract the constitutionally insufficient process afforded immigrants subject to *in absentia* removal orders, for instance by undertaking additional legal representations, outreach efforts, and advocacy. If ImmDef had not been compelled to expend these resources, it would have directed them toward other efforts to represent individuals in immigration court and otherwise advance immigrants' rights and combat other abuses in the immigration-enforcement system.

78.    Plaintiff Public Counsel also runs several programs to protect the rights of immigrants facing deportation, including people fleeing Central America. Public Counsel provides know-your-rights trainings and individualized legal assistance to detained individuals,

including those who are detained after having previously received *in absentia* removal orders. When they encounter such individuals, Public Counsel attorneys must prioritize assisting them by explaining the requirements for filing motions to reopen, and, in some cases, filing the motions on their behalf. Because of the imminent threat of deportation in such cases, Public Counsel must divert immediate resources to them, at the expense of education other detainees in need of advice and/or taking on representation in other cases. Motion to reopen work is substantial. It may involve contacting the detainee's family members on an expedited basis, speaking with local ICE authorities or detention center personnel, attempting to obtain the relevant documents from the A-file through extraordinary channels, and assisting with the filing of a motion to reopen on an extremely expedited basis.

79.     Public Counsel has other programs that serve Central Americans fleeing persecution. For example, Public Counsel has several staff attorneys who represent children facing removal. Those attorneys have represented people who entered the United States as unaccompanied children and were later ordered removed *in absentia*. In some cases those children have come to Public Counsel through the foster-care system, while in others they have come through the adult-detainee population. Regardless of how the case arises, Public Counsel's attorneys are forced to act more quickly in these cases in order to prevent execution of the *in absentia* removal order before a judge has had the opportunity to examine the individual's defenses.

80.     Because of the risk that a large number of its constituents could be immediately deported without a hearing, Public Counsel has been forced to expend resources on creating a new program to train attorneys on screening individuals in advance of the technically complex processes for preparing and filing written motions to reopen. Public Counsel has had to divert non-immigration attorneys from its other programs to receive training on and assist with handling these screenings. Public Counsel also has had to educate the legal community and members of the immigrant community on how to learn of the existence of *in absentia* orders and what legal strategies exist for challenging such orders. Thus, at the expense of fully pursuing its

core goals, Public Counsel has been compelled to devote significant portions of its limited resources to counteract the constitutionally insufficient process afforded immigrants subject to *in absentia* removal orders, for instance by undertaking additional legal representations, outreach efforts, and advocacy. If Public Counsel had not been compelled to expend these resources, it would have directed them toward other efforts to advance immigrants' rights and other abuses in the immigration-enforcement system.

81.     Each of these organizations also engages in public advocacy to inform immigrant families and the general public about the risks associated with *in absentia* orders and to advocate against their use. For example, CARECEN-LA, ImmDef, and Public Counsel, along with other groups, organized a press conference to protest the Obama Administration's raids against Central American refugees in January 2016.

**Imminent Deportations of Families and Children Subjected to the "Rocket Docket."**

82.     While families and children who receive *in absentia* removal orders have been at risk of deportation for years, the government has not consistently targeted them specifically in its enforcement efforts. The Obama Administration did so briefly in January 2016 and was heavily criticized for doing so. *See, e.g.*, Josh Gerstein and Seung Min Kim, *Obama administration kicks off family deportation raids*, Politico (Jan. 4, 2016),

https://www.politico.com/story/2016/01/obama-family-deportation-raids-217329 (describing raids affecting several dozen people in January 2016).

83.     Upon information and belief, the situation has now changed. The President himself tweeted on June 17, 2019, that "[n]ext week ICE will begin the process of removing the millions of illegal aliens who have illicitly found their way into the United States." Recent reports indicate that the President was referring to a plan to target families and children with *in absentia* removal orders en masse. In addition, on June 19, 2019, Mark Morgan, Acting Director of ICE, announced the upcoming mass arrests would include among its targets 2,000 families who recently arrived, were part of an expedited court process, failed to report for their hearing,

and were ordered deported in early 2019. After a brief pause, on June 28, 2019 the President

reiterated that ICE immigration raids would start in about a week, sometime after July 4.

84.     These reports are consistent with earlier ones suggesting the Administration first

considered plans to target families and children subject to *in absentia* orders at least two years

ago. As reported in September 2017, "[t]he Trump administration is weighing a new policy that

would fast-track the deportation of thousands of Central American teenagers who arrived at the

southern border, unaccompanied by adults. . . . This new policy would call for expedited

deportation of . . . the more than 150,000 children who arrived at the southern border alone,

escaping violence and poverty in El Salvador, Honduras and Guatemala. Under the plan being

discussed . . . they would not see an immigration judge first."[18]

85.     Upon information and belief, those plans were delayed by officials who thought

them too draconian, if not unlawful. Those officials are now gone.[19]

## LEGAL BACKGROUND

86.     The central legal injury that Plaintiffs face arises from the government's view that

it may use *in absentia* removal orders to summarily deport unrepresented families and children,

despite the massive notice deficiencies and other errors that infected thousands of those orders.

87.     The Constitution and immigration laws require that individuals facing deportation

receive hearings at which they can present their defenses. The Supreme Court held over one

hundred years ago that the Fifth Amendment protects people facing deportation and therefore

entitles them to notice, hearings, and other basic Due Process protections. *Yamataya v. Fisher*,

189 U.S. 86 (1903).

88.     Immigration statutes codify that basic principle by providing a hearing and other

protections to all people in removal proceedings, including those who have a credible fear of

---

[18] *See* Franco Ordonez, *Exclusive: Trump team drafting plan to deport more young people — Central American teens*, (Sept. 21, 2017), http://www.mcclatchydc.com/news/politics-government/white-house/article174488221.html#storylink=cpy.

[19] Zolan Kanno-Youngs, *In Shift, U.S. Vows to More Aggressively Deport Migrant Families*, N.Y. TIMES, June 4, 2019, https://www.nytimes.com/2019/06/04/us/politics/ice-migrant-families.html (last visited June 19, 2019).

persecution or torture. *See generally* 8 U.S.C. 1229a, 1225(b). Under these statutes and the Fifth Amendment, individuals in removal proceedings are entitled to "a full and fair hearing which provides a meaningful opportunity to be heard." *Lin v. U.S. Dept. of Justice*, 453 F.3d 99, 104-105 (2d Cir. 2006) (quoting *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004)).

89.     While, as noted above, the statute and agency regulations on their face permit the deportation of individuals who failed to appear without further process, neither the Due Process Clause nor the refugee-protection provisions of the immigration laws permit application of that rule to unrepresented families and children ordered deported *in absentia* since 2014. Thousands of people in that group certainly failed to appear through no fault of their own, lack the ability to file a motion to reopen, and will face persecution or torture if returned to their home countries. Under those conditions, the risk of erroneous deprivation arising from the imposition of a requirement that they file a written motion to reopen *before* they can appear in court is intolerably high and therefore violates the Fifth Amendment and the immigration laws.

90.     Several courts have issued injunctions against ICE's use of process-free mass removals where particular populations were targeted for expedited enforcement, in order to provide such individuals meaningful access to procedures needed to seek immigration relief. *See Chhoeun v. Marin*, 306 F.Supp.3d 1147, 1162 (C.D. Cal. 2018) ("The Court has found that Petitioners [Cambodian nationals] are likely to succeed on their claim that removal without an opportunity to file and litigate motions to reopen constitutes a deprivation of Petitioners' due process rights"); *Devitri v. Cronen*, 289 F.Supp.3d 287, 295 (D. Mass. 2018) ("Petitioners have proven a likelihood of success on their due process claim that they will suffer prejudice through a denial of a meaningful opportunity to have a motion to reopen and motion to stay ruled on by the BIA and Court of Appeals prior to removal to a country [Indonesia] where they have a credible fear of persecution"); *but see Hamama v. Adducci*, 912 F.3d 869, 874 (9th Cir. 2018) ("The Attorney General's enforcement of long-standing removal orders . . . is not subject to judicial review").

## COUNT I

### Violation of the Due Process Clause of the Fifth Amendment

### to the United States Constitution

91.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

92.     The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

93.     Defendants' actions, policies, and practices violate the Due Process Clause of the Fifth Amendment.

## COUNT II

### Violation of the Immigration and Nationality Act, Prohibition on Removal to

### Country Where Individual Would Face Persecution or Torture

94.      All of the foregoing allegations are repeated and realleged as though fully set forth herein.

95.      Defendants' actions, policies, and practices violate the refugee-protection provisions of the INA, including 8 U.S.C. 1229a(b)(4)(B), 8 U.S.C. 1229a(b)(5)(C), 8 U.S.C. 1229a(c)(7), 8 U.S.C. 1231(b)(3), the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. 1231), and 8 C.F.R. 208.16-18 (implementing prohibition on deportation in the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment).

## PRAYER FOR RELIEF

Plaintiffs ask this Court to grant the following relief:

1.      A declaration that, under the Due Process Clause, all currently unrepresented families and children who were ordered removed *in absentia* on or after May 1, 2014 are entitled, prior to their physical removal, to (1) a hearing before an immigration judge, with all its attendant

procedural protections, in order for the judge to determine whether their removal order should be rescinded; and (2) access to the A-files and Records of Proceedings containing information about their cases, to obtain information relevant to that determination, with sufficient time prior to that hearing to permit them to prepare for it.

2.      An order requiring Defendants, (1) prior to physically removing any currently unrepresented family or child who was ordered removed *in absentia* on or after May 1, 2014, to hold a hearing to determine whether their removal order should be rescinded; and (2) grant each such person access to their A-files and Records of Proceedings with sufficient time prior to that hearing to permit them to prepare for it.

3.       Plaintiffs' reasonable attorneys' fees, costs, and other disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412; and

4.      Any and all such other relief as the Court deems just and equitable.


DATED: July 11, 2019                    Respectfully submitted,

                                        MUNGER, TOLLES & OLSON LLP
                                          MELINDA E. LEMOINE

                                          BRADLEY S. PHILLIPS*
                                          GREGORY D. PHILLIPS*
                                          ROBERT L. DELL ANGELO*
                                          SKYLAR BROOKS*
                                          GINA F. ELLIOTT*


                                        By:        /s/ *Melinda LeMoine*
                                            _____


AHILAN T. ARULANANTHAM*
aarulanantham@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5211
Facsimile: (213) 977-5297

BRADLEY S. PHILLIPS*
brad.phillips@mto.com
GREGORY D. PHILLIPS*
gregory.phillips@mto.com
ROBERT L. DELL ANGELO*
robert.dellangelo@mto.com
MELINDA E. LEMOINE
melinda.lemoine@mto.com
SKYLAR BROOKS*
skylar.brooks@mto.com
GINA F. ELLIOTT*
gina.elliott@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

CHRISTOPHER DUNN
AMY BELSHER
ROBERT HODGSON
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street—19th Floor
New York, New York 10004
T: (212) 607-3300
F: (212) 607-3318
cdunn@nyclu.org

*Application for Pro Hac Vice forthcoming

# EXHIBIT A

February 9, 2015


Juan Osuna
Director of the Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902
Falls Church, VA 20530


Sarah Saldaña
Assistant Secretary
Department of Homeland Security (DHS)
U.S Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536


Ken Tota
Acting Director
Administration for Children and Families
901 D Street, SW
ORR/8th Floor
Washington, DC 20447


Dear Sir or Madam:

The undersigned organizations write to express our concern that Immigration Judges nationwide have issued, and are continuing to issue, large numbers of *in absentia* removal orders against recently-arrived children who did not receive notice of their removal proceedings. Legal service providers, social service providers, and immigration advocates that work with children in removal proceedings have received numerous reports throughout the country of significant numbers of children who have either received defective notice of their removal proceedings and upcoming hearing dates, or who have not received notice at all. Yet immigration courts have issued and continue to issue numerous *in absentia* removal orders against such children, including those without legal representation. *In absentia* orders should not be issued on children's cases when they have not received adequate notice of their immigration proceedings.

We suggest that you take following steps to remedy this problem. First, we appreciate the endeavors this Administration, Office of Refugee Resettlement (ORR) and the Executive Office for Immigration Review (EOIR) have taken to provide counsel for children; we ask that this program be expanded to ensure no unaccompanied child will go before an immigration judge alone. Second, we ask that you immediately put procedures in place to ensure that children are given proper legal notice of their removal proceedings and hearing dates. Third, in light of the significant numbers of children who recently have received *in absentia* removal orders without notice, we request that for every child who has received an *in absentia* removal order on or after May 24, 2014, Department of Homeland Security (DHS) should move to reopen. EOIR should grant that request, or alternatively, EOIR should reopen a child's removal proceedings *sua*

1

*sponte.* EOIR should administratively close those children's case they are unable to provide adequate legal notice of the new hearing. Going forward, EOIR should also grant continuances in children's cases until such time as they can be sure proper legal notice is provided. Finally, EOIR should allocate sufficient resources in order to update the EOIR hotline in a timely manner.

As you know, immigration courts have been directed to ensure that recently-arrived children have their first master calendar hearing date within 21 days of the date that their notice to appear ("NTA") is filed with the immigration court.[1] Many immigration courts, including those with the highest volumes of cases, have responded to this directive by establishing specialized dockets for handling children's cases. In the midst of the increase in children's cases, ORR, EOIR and DHS instituted a new procedure on May 1, 2014 meant to increase court efficiency and reduce the burden on sponsors to file change of address ("COA") or change of venue ("COV") forms. Under the new procedure, DHS issues the NTA with the immigration court location and hearing date marked "TBD" and delays filing the NTA until after the child is released to a sponsor or after 60 days, whichever is earlier, or unless the child requests an earlier hearing. In such cases, ORR, service providers and sponsors do not need to complete either the ORR Release Notification or the COV and COA forms. Instead, ORR emails a Discharge Notification form to various stakeholders. DHS procedure is to file the NTA with an immigration court based off the address from the Discharge Notification. Since the procedure has gone into effect, service providers have noticed a sharp increase in the breakdown in adequate notice to sponsors and children and on-going problems with NTAs being filed at the appropriate venue.

In addition to this, the online version of the packet that ORR distributes to sponsors contains the wrong form for updating one's address.[2] Instead of the form titled *Alien's Change of Address/Immigration Court*, the packet includes a form used for address changes once an appeal is pending with the BIA. Unlike the correct form, this form does not contain any warnings about the consequences of failing to update one's address and it is pre-addressed to the BIA in Falls Church, Virginia—not to the local immigration court.  Another issue resulting from the delay in filing are cases in which a child and their sponsor move before their NTA is filed. Without knowing which court they will be required to appear in, a child cannot file their EOIR-33. This can result in additional no-notice *in absentia* orders.

Compounding this problem is the recent mandate to expedite the cases of recently-arrived children. Because EOIR is now required to have a child's first master calendar hearing within 21 days of the NTA's filing, there is not enough time to identify these errors before the court issues the invalid hearing notice.

Regardless of the exact point where the flow of information is breaking down, these communication failures, combined with the mandate to expedite children's cases, are clearly resulting in ubiquitous notice problems. We have received many reports of hearing notices arriving with only a few days' advance warning, and some reports of them arriving *after* a scheduled hearing date has passed. In some cases, the hearings were set to take place over a

---

[1] *See* David Rogers, *Migrants' right to counsel argued*, Politico (Sept. 3, 2014) (quoting counsel for the government at oral argument in *J.E.F.M. v. Holder* as stating existence of 21-day policy).
[2] *See* ORR Div. of Children's Services, *Sponsor Handbook*, PDF at 12-13.
https://www.acf.hhs.gov/sites/default/files/orr/sponsor_handbookrev_09_15_2014.pdf.

AILA Doc. No. 15030961. (Posted 3/9/15)

thousand miles away from the address to which the notice was sent just days beforehand. For example:

- Two sisters were initially detained in Los Angeles, where their NTAs were filed, but were subsequently released to a sponsor in Alexandria, Virginia. The sisters did not receive notice of their hearing date, so their lawyer called EOIR in mid-July 2014 and found out that they had a hearing scheduled for early/mid-September 2014. This lawyer submitted a notice of appearance and a venue change request via U.S. mail to the Los Angeles Immigration Court, requesting a transfer to the Arlington Immigration Court. Much to the sisters' surprise, on July 28, 2014, they received a notice stating that their hearing dates had been set for *that very afternoon in Los Angeles*. The notices were dated July 23, 2014, and had been sent via regular mail to the sisters' address in Virginia. The sisters' lawyer managed to avert the entry of an *in absentia* order only by calling in a personal favor with a local Los Angeles attorney, who covered the girls' hearing and requested a venue transfer.[3]
- In the last quarter of Fiscal Year 2014, one regional post-release social service provider reported that out of her caseload of 13 cases, only in one case was the hearing notice provided before the hearing.[4]
- One child who was in ORR custody in Virginia was awaiting a home study on the sponsor in New Orleans prior to the child's release. The legal service provider checked the EOIR hotline and discovered that the child's hearing was scheduled miles away in the New Orleans immigration court for a hearing several days later, despite the child having not been released from ORR custody.[5]

In other cases, children are not receiving notice of their hearings at all. The reasons for these notice failures appear to be complex, but much of this phenomenon also is likely explained by the large numbers of children who have been required to appear in immigration court on an expedited basis. For example, legal and social service providers have observed an increase in database and human errors on the part of government actors, such as incorrect entry of addresses, and addresses on file with EOIR that do not match the addresses provided by the ORR sponsors. These malfunctions not only result in initial notice failures, but also stymie those children and custodians who make diligent efforts to obtain crucial information regarding their cases. The EOIR hotline, which sponsors rely on in order to obtain case status updates, often contains incorrect information or is not updated in a timely fashion. We have also heard reports of sponsors calling courts for assistance with filling out change-of-address forms, only to be turned away without instructions or told that they must wait to receive a notice of hearing before they are allowed to move. For example:

- In Los Angeles, an ORR sponsor received a hearing notice for the child living with her, as well as a notice for *a child completely unknown to her*. The ORR sponsor drove to the unknown child's address and delivered the notice of hearing personally. The notice stated that this child was required to appear in immigration court three days later. But for this

---

[3] Decl. of Simon Sandoval-Moshenberg, *J.E.F.M. v. Holder,* 14-cv-01026-TSZ (July 31, 2014), Dkt. 34, ¶¶9-12.

[4] Lutheran Immigration and Refugee Service (LIRS), report from partner (November 2014).

[5] CAIR Coalition (January 2015).

3

particular sponsor's generosity, the child would never have received notice of her fast-approaching hearing date.

- In *J.E.F.M. v. Holder*, the Plaintiffs filed an amended complaint which added a new plaintiff named J.E.V.G. to the case.[6] J.E.V.G. had never received notice of his first removal hearing date. When he did not appear at the hearing, the immigration judge issued an *in absentia* removal order against him. After he was added as a plaintiff to the federal lawsuit, the government conducted a review of J.E.V.G.'s file, which revealed that EOIR had sent notice to an incorrect mailing address, likely resulting from an error transcribing his address in the EOIR database.
- One teenage girl never received her notice in the mail. She was instructed by her post-release social service provider to call the hotline every day. The girl, however, was using the Alien number of her son—not realizing that her number corresponded to a separate case. Each time she called there was no hearing scheduled. The post-release service provider then called on her behalf two weeks later and discovered that the girl and her son both had received removal orders *in absentia*.[7]

These widespread notice problems are no doubt responsible, at least in part, for the large numbers of children who have been ordered removed *in absentia* during the latter half of 2014. According to EOIR's own data, from July 18, 2014 to October 1, 2014, immigration courts issued 1,449 *in absentia* orders against children who did not appear for their hearing dates.[8] No doubt that number has risen since October 1, 2014. Moreover, legal services providers have submitted sworn affidavits in *J.E.F.M. v. Holder,* 14-cv-01026-TSZ (W.D. Wash.), attesting to the entry of at least dozens of *in absentia* removal orders against children, including in some cases where notice was plainly deficient.[9]

While the government has initiated new programs expand legal counsel for vulnerable groups, the vast majority of unaccompanied children still do not have access to counsel. The representation rate of children in immigration court has dropped precipitously, from 71% in 2012 to as low as 14-15% in some months of 2014.[10] As data on case outcomes indicates, legal representation vastly increases the chances that a child will appear in immigration court: Over the last decade, only 6.1% of children with counsel received *in absentia* removal orders, compared with 64.2% of unrepresented children.[11] The intervention of counsel would no doubt

---

[6] Second Amended Compl., *J.E.F.M. v. Holder*, 14-cv-01026-TSZ (Dec. 1, 2014), Dkt. 95, ¶¶109-12.

[7] Story from Lutheran Immigration and Refugee Service (2014).

[8] David Rogers, *Thousands of child migrants still lack lawyers*, Politico (Nov. 6, 2014), http://www.politico.com/story/2014/11/child-migrants-lawyers-112654 html.

[9] Decl. of Tin Thanh Nguyen, *J.E.F.M. v. Holder,* 14-cv-01026-TSZ (Aug. 25, 2014), Dkt. 63, ¶¶12-13 (to the best of declarant's recollection, immigration judge in Charlotte ordered removed in absentia all children who did not appear to hearings on July 31, 2014 and August 12, 2014; one child who appeared in court had received fewer than four days' notice); Decl. of Simon Sandoval-Moshenberg, *J.E.F.M. v. Holder,* 14-cv-01026-TSZ (July 31, 2014), Dkt. 34, ¶¶9-12 (describing children living in Virginia who received notice only two days prior to hearing in Los Angeles Immigration Court); Decl. of Stacy Tolchin, *J.E.F.M. v. Holder,* 14-cv-01026-TSZ (July 31, 2014), Dkt. 31, ¶¶3-5; (same).

[10] Transactional Records Access Clearinghouse, *Representation for Unaccompanied Children in Immigration Court*, http://trac.syr.edu/immigration/reports/371/ (Nov. 25, 2014).

[11] Transactional Records Access Clearinghouse, *Juveniles — Immigration Court Deportation Proceedings Court Data through December 2014*, http://trac.syr.edu/phptools/immigration/juvenile/ (last visited Jan. 21, 2015).

AILA Doc. No. 15030961. (Posted 3/9/15)

have prevented numerous children from receiving *in absentia* orders in recent months. For example, on a single day in August, legal service organizations filed change of venue motions for 200 children scheduled for hearings at the Chicago immigration court, but who no longer lived in the area.[12] Without the work of those organizations, many if not all of those children would now have removal orders.

Despite mounting evidence of these pervasive and systemic notice deficiencies, Immigration Judges have ordered and continue to order the removal of children who fail to appear for their hearings. ORR sponsors frequently find out about the resulting *in absentia* order only when a legal service provider or a post-release social service provider takes it upon herself to obtain the sponsor's phone number and contact them. And, we presume, many such sponsors likely never find out that the children in their care have been ordered removed *in absentia*.

*In absentia* removal orders issued against children who have failed to receive proper notice violate both the INA and the U.S. Constitution. *See, e.g., Reno v. Flores,* 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in [removal] proceedings[.]"); *see also Matter of G-Y-R,* 23 I&N Dec. 181 (BIA 2001) (due process requires that non-citizens receive notice of their removal hearings that is reasonably calculated to reach them). In keeping with these requirements, the INA and agency regulations require that all respondents in removal proceedings receive proper notice of their hearings, and also create additional protections specific to children. *See* 8 U.S.C. § 1229(a)(1)-(2); 8 C.F.R. § 103.8(c)(2)(ii); 8 C.F.R. § 236.2(a); *see also G-Y-R,* 23 I&N Dec. at 189-90 (recognizing that respondents may not be ordered removed *in absentia* until they are warned – by proper service of the NTA – that consequence of failing to inform government of change in address is entry of removal order). If the child does not attend a removal hearing because she was not provided proper notice of the hearing, she may have the resulting *in absentia* removal order rescinded. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii).

Given that a significant proportion of recently-arrived children who have been ordered removed *in absentia* have received defective or no notice of their hearing dates, thereby violating their statutory and constitutional due process rights, the government must take steps to prevent these notice problems in the future and undo the harm that has already been done. The circumstances of one of the named plaintiffs in *J.E.F.M. v. Holder* illustrates the effectiveness of the remedial measures that we propose. As noted above, one of the new Plaintiffs in that case, J.E.V.G., never received notice of his first removal hearing date and received an *in absentia* removal order.[13] After the government ascertained that EOIR had sent his hearing notice to the wrong address, it then filed a motion to reopen J.E.V.G.'s *in absentia* order, acknowledging its error.[14] Based on our experience serving these children and the reports of service providers throughout the country, we suspect there are at least dozens, if not hundreds, of children who did not receive notice, just as J.E.V.G. did not. A review of their files would likely reveal that DHS should move to reopen, or alternatively, EOIR should reopen *sua sponte* the child's case.

---

[12] Odette Yousef, *Lawyers Fear Speedy Deportations Harm Minors*, WBEZ 91.5 (Aug. 27, 2014), http://www.wbez.org/news/lawyers-fear-speedy-deportations-harm-minors-110715.

[13] Second Amended Compl., *J.E.F.M. v. Holder*, 14-cv-01026-TSZ (Dec. 1, 2014), Dkt. 95, ¶¶109-12.

[14] Defs' Br. Supplementing Their Mot. to Dismiss, *J.E.F.M. v. Holder*, 14-cv-01026-TSZ (Dec. 1, 2014), Dkt. 97, at 10 n.6.

AILA Doc. No. 15030961. (Posted 3/9/15)

In conclusion, the increased volume of children's cases in immigration courts, combined with the government's mandate to expedite the those cases, has resulted in numerous *in absentia* removal orders that were issued in violation of the constitutional, statutory, and regulatory due process rights of children in removal proceedings. To remedy the violations that these children have suffered, we recommend that the Government take the following steps:

1. Unaccompanied children in removal proceedings should be appointed counsel, no child should be forced to navigate the complex immigration system alone.

2. For every child who has received an *in absentia* removal order on or after May 24, 2014, Department of Homeland Security (DHS) should move to reopen. EOIR should grant that request, or alternatively, EOIR should reopen a child's removal proceedings *sua sponte*, and EOIR should administratively close those children's case they are unable to provide adequate legal notice of the new hearing. Going forward, EOIR should also grant continuances in children's cases until such time as they can be sure proper legal notice is provided.

3. Implement reliable procedures to ensure that children are provided fair and accurate notice of their hearings, while not unduly burdening the sponsor or child by having to file COVs or COAs.

4. Ensure children are adequately advised of their right to request a hearing prior to the 60 day filing delay; in particular this consequence needs to be explained to children who do not have family reunification resources and children in secure facilities.

5. Pending the implementation of reliable procedures and practices for providing notice, EOIR should direct the immigration courts to grant continuances to non-appearing pro se children and continue to permit legal service providers to attempt to contact them, rather than entering *in absentia* removal orders against them. EOIR should also accept EOIR-33 forms at a central location as children and their sponsors do not have a court address prior to the filing.

6. Allocate sufficient resources to the EOIR hotline procedures to ensure it is updated in a timely fashion and serves its purpose of facilitating notice.

We look forward to working with you in improving and implementing the above recommendations. Thank you for your attention.

Sincerely,

American Friends Service Committee
Americans for Immigrant Justice

AILA Doc. No. 15030961. (Posted 3/9/15)

American Immigration Lawyers Association
Ascentria Care Alliance
Asian Pacific Institute on Gender Based Violence
ASISTA Immigration Assistance
Atlas: DIY
Bethany Christian Services
Boston University Immigrants' Rights Clinic
Brooks Immigration, LLC
Capital Area Immigrants' Rights (CAIR) Coalition
Catholic Legal Immigration Network Inc. (CLINIC)
CCDA - Hogar Immigrant Services
Center for Gender & Refugee Studies
Center for the Human Rights of Children, Loyola University Chicago
Children's Choice, Inc.
Children's Law Center of Massachusetts
Church World Service
Community Legal Services in East Palo Alto
Durham/Orange Woman Attorneys (D.O.W.A.)
First Focus
Florence Immigrant and Refugee Rights Project (FIRRP)
Grossman Law, LLC
HIAS Pennsylvania
Hofstra Youth Advocacy Clinic
Immigration Center for Women and Children
Immigration Counseling Service (ICS)
Kids in Need of Defense (KIND)
Las Americas Immigrant Advocacy Center
Law Office of Jennifer M. Smith, P.C.
Legal Services for Children
LifeBridge Community Alliance (Phoenix, AZ)
Lutheran Children and Family Service of Eastern Pennsylvania
Lutheran Immigration and Refugee Service (LIRS)
Lutheran Services Carolinas
Morrison Child & Family Services
National Immigrant Justice Center
National Immigration Law Center
National Justice for Our Neighbors
National Latin@ Network; Casa de Esperanza
Neighborhood Ministries (Phoenix, AZ)
North Carolina Justice Center
Northwest Immigrant Rights Project

7

Pangea Legal Services
Public Counsel
RAICES
Refugio del Rio Grande
Rocky Mountain Immigrant Advocacy Network
Sin Fronteras
Tahirih Justice Center
The Door's Legal Services Center
Tulsa Immigration Resource Network, University of Tulsa College of Law
U.S. Committee for Refugees and Immigrants
UC Davis School of Law Immigration Law Clinic
Urban Justice Center's Peter Cicchino Youth Project
Women's Refugee Commission
Young Center for Immigrant Children's Rights

AILA Doc. No. 15030961. (Posted 3/9/15)

# EXHIBIT B



125 Broad Street
New York, NY 10004
212.607.3300
212.607.3318
www.nyclu.org

February 9, 2015

**VIA OVERNIGHT MAIL**

Hon. Robert D. Weisel
Assistant Chief Immigration Judge
Executive Office for Immigration Review
26 Federal Plaza
12th Floor, Room 1237
New York, NY 10278

Dear Assistant Chief Judge Weisel:

On behalf of the New York Civil Liberties Union, we write to express our concern that immigration judges assigned to the juvenile docket at 26 Federal Plaza are ordering the removal of unaccompanied children ("UACs") who have not received notice of their hearings. In the midst of the sharp increase in the number of UACs arriving to the region, breakdowns in, and changes to, normal agency procedures appear to have led to pervasive failures to provide adequate notice of hearings.

In your role as Assistant Chief Judge, you have worked admirably to ensure that proceedings are as humane and fair as possible, given the inherent constraints of the immigration laws. To take but one example, as the pressures of the "priority" docket mounted, you worked with legal service providers to offer screenings and referrals to UACs who come to 26 Federal Plaza. We believe, however, that the court can and should take greater care to protect the due process rights of UACs who—through no fault of their own—have not attended their hearings. We therefore urge you to take immediate steps to halt this practice, to review recently issued *in absentia* removal orders for possible rescission, and to work with the Department of Homeland Security (DHS) and Office of Refugee Resettlement (ORR) to ensure that UACs are provided accurate and timely notice of their hearings.

**Background**

UACs often have fled extreme violence and endured tremendous hardships along their journey to New York. Removal orders carry grave consequences for these children. Most therefore have good reason to attend their hearings at 26 Federal Plaza, as they are eligible for relief from removal and can access legal consultation on-site. When they do not attend court, it is often because they are simply unaware that a hearing has been scheduled to decide their fate.

The number of UACs increased sharply in the spring and summer of 2014. While there were fewer than 1,000 monthly referrals to ORR in March 2012 and around 2,000 in March

2013, the number hit 5,527 in March 2014 and jumped to 10,128 in June.[1]  During FY 2014, ORR released 5,955 UACs to sponsors in New York and has released hundreds more since then.[2]

In the wake of these increases, agency procedures for updating records of UACs and providing notice of hearings have failed in several ways, described below.  Meanwhile, EOIR has begun requiring initial hearings to be held within 21 days of the filing of a Notice to Appear ("NTA").[3]  Especially given the government's ongoing refusal to appoint counsel to these respondents, these developments are a recipe for *in absentia* removal orders that violate due process.  The problems described below affect children nationwide, but their impact is magnified in this region because of the large number of UACs here.  An organization permitted by the court in November and December 2014 to make telephone calls to non-appearing respondent UACs estimates that 50% of these individuals never received notice of their hearing.  While the court has liberally granted continuances in cases of non-appearing UACs, these temporary reprieves do not fix the underlying problem if respondents continue not to receive notice of future hearings.

**Breakdowns in, and Changes to, Normal Procedures**

Historically, ORR has played a crucial role in ensuring that UACs' addresses are up-to-date at DHS and EOIR.  This is necessary in cases where DHS has recorded an address—for example, one obtained during interrogation following the child's apprehension—and transmitted it to EOIR prior to the child's release to a sponsor.  Once ORR releases a child, however, notices should not be sent to this address, but rather should be sent to the sponsor's address.

Until the summer of 2014, when a UAC was to be released from ORR custody to a sponsor, the ORR case manager would complete an *ORR Notification to ICE Chief Counsel: Release of Unaccompanied Alien Child to Sponsor and Request to Change Address* form ("Release Notification") and send it both to ICE Office of Chief Counsel ("OCC") and to the EOIR Immigration Court Administrator.  ORR also had responsibility for ensuring completion of EOIR change-of-venue and change-of-address forms.  Within 24 hours of the UAC's release, it also would generate a "Discharge Notification" and email it to the DHS Field Office Juvenile Coordinator and other stakeholders.  This procedure helped ensure that address information was timely conveyed to DHS and EOIR and that hearing notices were mailed to the correct address.

In the midst of the increase in children's cases, ORR discontinued this procedure in most situations, a change seemingly meant to parallel a shift by DHS in its approach to issuing NTAs to UACs.[4]  Increasingly often, DHS issues the NTA with the immigration court location and

---

[1]  Lisa Seghetti, et al., Cong. Research. Serv., R43599, *Unaccompanied Alien Children: An Overview* 10 (2014).

[2]  Office of Refugee Resettlement, *Unaccompanied Children Released to Sponsors By State*, acf.hhs.gov/programs/orr/programs/ucs/state-by-state-uc-placed-sponsors (last visited Feb. 9, 2015).

[3]  Memorandum from Brian O'Leary, Chief Immigration Judge to All Immigration Judges, *Docket Practices Relating to Unaccompanied Children Cases in Light of the New Priorities* (Sept. 10, 2014).

[4]  Office of Refugee Resettlement, *Program Guidance - Notice to Appear Changes*, July 3, 2014.  The pre-summer-2014 procedure remains in place for cases in which the NTA lists a hearing location, and separate procedures exist for UACs in ORR custody for more than sixty days or who request an expedited

hearing date marked "TBD" and delays filing the NTA until after the UAC is released to a sponsor. In such cases, ORR completes neither the Release Notification nor the change-of-venue and change-of-address forms; it merely emails a Discharge Notification to various stakeholders, including DHS but not EOIR. DHS is supposed to file the NTA using the address from the Discharge Notification, but it appears to have failed to do so in numerous cases. Consequently, in reliance on faulty information, EOIR has mailed hearing notices to incorrect addresses.

At the same time that this new procedure (applicable when the NTA is marked "TBD") removes the procedural safeguards of the Release Notification and assistance in completing change of address and venue forms, the burdens and expectations placed upon UACs and their sponsors remain—and even have intensified: ORR often instructs sponsors to call the EOIR case status information hotline daily to find out about court date and location. Setting aside that this imposition is no substitute for the government fulfilling its obligation to provide notice, legal service providers report that information available through the hotline sometimes is incorrect.

A UAC who needs to relocate following her release from ORR's care faces even more daunting obstacles. As the court can readily appreciate, there are many reasons why a child may need to move to a safer or more suitable home post-release. To do so, the child (presumably with help from her ORR sponsor, when such help is available) must navigate a procedural maze. She must fill out Form EOIR-33, *Alien's Change of Address Form/Immigration Court*, which is available only in English and which is addressed to immigration respondents generally—not to UACs or sponsors. She must serve this form on DHS counsel and file it in court with proof of service. The form states that "[c]hanges in address or telephone numbers communicated through any means except this form . . . will not be recognized and the address information and record will remain unchanged." Indeed, the NYCLU has heard reports of sponsors calling the court for assistance with changing their address and being turned away without instructions or told that they must wait to receive a notice of hearing before they are permitted to move (a potentially long wait, since DHS may not file the NTA until months after ORR releases the child). The sponsor or UAC must also compose, serve, and file any necessary change-of-venue motion. Separately, she is required within ten days to fill out and file with DHS form AR-11, *Alien's Change of Address Card*. A sponsor searching the internet for the proper form likely would turn up the intuitively titled but inapplicable I-865, *Sponsor's Notice of Change of Address*, a form applicable to sponsors petitioning for a relative to obtain an immigrant visa or adjust status.

It is a harsh legal fiction to require UACs—for whom English typically is not their first language and who frequently are not represented by counsel[5]—to navigate these procedures, but

---

hearing. This multiplicity of procedures appears to have caused confusion at ORR and likely has contributed to the failure to provide adequate notice of immigration hearings.

[5] That non-appearing UACs typically are unrepresented is an additional factor cautioning against entering *in absentia* orders, as minors represented by counsel with a fixed address are more likely to receive notice of their hearings. Over the last decade, they appeared 94.7% of the time, compared with 66.3% for unrepresented minors. American Immigration Counsel, *Taking Attendance: New Data Finds Majority of Children Appear in Immigration Court* (July 2014), *available at* www.immigrationpolicy.org/just-facts/taking-attendance-new-data-finds-majority-children-appear-immigration-court. There is a pending class action to secure appointed counsel for unrepresented minors in immigration proceedings. *See J.E.F.M. v. Holder,* 14-cv-01026 (W.D. Wash. filed July 9, 2014).

there are even greater causes for confusion. The online version of the packet that ORR distributes to sponsors contains the **wrong form** for updating one's address.[6] Instead of the *Alien's Change of Address Form/Immigration Court*, the packet includes a form used for address changes once a case has reached the BIA. Unlike the correct form, this form does not contain any warnings about the consequences of failing to update one's address. Moreover, it is pre-addressed to the BIA in Falls Church, Virginia—not to 26 Federal Plaza. Thus, while foisting upon these vulnerable children the responsibility for completing a complicated procedure crucial to protecting their rights, the government has provided incorrect instructions for doing so.

In addition to the aforementioned problems and procedural hurdles, legal service providers have reported an increase in problems likely resulting from the increase in the workloads of ORR, DHS, and EOIR and the mandate to expedite case scheduling, including:

- **Agency staff have recorded addresses incorrectly or in such a way that they do not print correctly.** Legal service providers have reported that the address on file with EOIR sometimes contains typos and therefore does not match the address provided by a sponsor to ORR. Where the address is correct, providers observed that the inclusion of the ORR sponsor's name in the "care of" line has caused the address not to fit within the transparent window on the front of the envelope EOIR uses to mail hearing notices.

- **Even when addressed correctly, notices have arrived only a few days before a scheduled hearing or even <u>after</u> the hearing date has passed.** Some ORR sponsors and UACs have found out about a missed hearing only when a legal service provider took it upon herself to seek the sponsor's phone number from the court and contact them.

Despite the scale of the notice problems outlined above, immigration judges at 26 Federal Plaza ordered hundreds of UACs deported *in absentia* during fiscal years 2014 and 2015, and no doubt many more have been spared this fate only temporarily through adjournments.[7]

## Brief Overview of Due Process Protections

The Fifth Amendment to the Constitution guarantees due process in all legal proceedings, including removal proceedings. *See, e.g.*, *Reno v. Flores,* 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in [removal] proceedings."); *see also Pierre v. Holder,* 588 F.3d 767, 777 (2d Cir. 2009) (observing that notice and opportunity to be heard are at "core" of due process in immigration proceedings); *Matter of G-Y-R* 23 I&N Dec. 181 (BIA 2001) (due process requires that non-citizens receive notice reasonably calculated to reach them). To comply with this guarantee, the INA and agency regulations impose rules and procedures to protect the rights of immigration respondents and additional procedural safeguards in cases involving children.

---

[6] *See* ORR Div. of Children's Services, *Sponsor Handbook*, PDF at 12-13, *available at* www.acf.hhs.gov/sites/default/files/orr/sponsor_handbookrev_09_15_2014.pdf (last visited Feb. 9, 2015).

[7] *See* TRAC Immigration, Syracuse University, *Juveniles — Immigration Court Deportation Proceedings* (as of Dec. 2014, for juvenile cases initiated in FY 2014 or 2015, showing that 198 resulted in *in absentia* orders and 5,779 remain pending) http://trac.syr.edu/phptools/immigration/juvenile.

For all respondents, the INA requires DHS to serve an NTA specifying, *inter alia*, "the nature of the proceedings," the "time and place at which the proceedings will be held," the charges, and the respondent's right to counsel at no cost to the government. 8 U.S.C. § 1229(a)(1). If the NTA does not include notice of the time and place of the initial hearing, then EOIR "is responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing." 8 C.F.R. § 1003.18(a).

When DHS moves for an *in absentia* removal order, it carries the burden of establishing "by clear, unequivocal and convincing evidence" that written notice was provided to the respondent. 8 U.S.C. § 1229a(b)(5)(A). This quantum of proof echoes the standard announced in *Woodby v. I.N.S* to protect respondents' due process rights in light of the "drastic deprivations" that deportation causes. 385 U.S. 276, 285-86 (1966). At a minimum, the record must establish that "the notice was **accurately addressed and mailed in accordance with normal office procedures**." *Lopez v. Gonzales,* 468 F.3d 81, 84 (2d Cir. 2006) (emphasis added). Even then, only a weak presumption attaches that notice was received and may be rebutted through circumstantial evidence, such as that the respondent may have been relief-eligible and therefore had an interest in attending any hearing of which she had notice. *Silva-Carvalho Lopes v. Mukasey*, 517 F.3d 156, 160 (2d Cir. 2008).

Federal immigration law provides even stronger due process protections for minors in light of the special needs and vulnerabilities of children, and UACs in particular.[8] As especially relevant here, service of the NTA on minors under 14 "shall be made upon the person with whom . . . the minor resides" and "whenever possible, service shall also be made on the near relative, guardian, committee, or friend." 8 C.F.R. § 103.8(c)(2)(ii).[9] Failure to comply with this regulation may violate a child's due process rights, "when DHS's failure to make proper service of a NTA culminates in the entry of an *in abstentia* [*sic*] removal order." *Nolasco v. Holder,* 637 F.3d 159, 164 (2d Cir. 2011) (citing *Matter of Mejia-Andino*, 23 I. & N. Dec. 533 (BIA 2002) (en banc) (vacating removal order where minor's parents never received notice of hearing)).

In short, federal immigration law recognizes the special need for robust safeguards to protect the due process rights of UACs. When these safeguards do not function properly, as has occurred in recent months, *in absentia* orders violate UACs' due process rights.

---

[8] *See, e.g.*, Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) (establishing that minors in federal immigration custody must be treated with "dignity, respect and special concern for their particular vulnerability as minors"), *available at* www.aclu.org/files/pdfs/immigrants/flores_v_meese_agreement.pdf; Homeland Security Act of 2002, PL 107–296, § 462(b)(2) (charging ORR with responsibility to ensure that UACs are placed in care settings where they "are likely to appear for all hearings or proceedings in which they are involved"); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, § 235 (providing additional safeguards for UACs); 8 C.F.R. § 1236.3 ("When a juvenile alien is apprehended, he or she must be given a Form I–770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands.").

[9] The Ninth Circuit has ruled that this notice requirement also applies to children between the ages of fourteen and eighteen. *See Flores-Chavez v. Ashcroft,* 362 F.3d 1150, 1157, 1163 (9th Cir. 2004).

**Recommendations**

In light of the foregoing, we make four recommendations.  The first is aimed at undoing the harm of *in absentia* removal orders already issued against UACs without adequate notice.  The second is aimed at preventing this due process problem going forward.  The third and fourth are aimed at protecting the rights of UACs whose cases are currently before the court.

1. We recommend that the court **conduct a review of each *in absentia* removal order entered against a UAC since May 1, 2014**.  This may involve coordination with DHS and/or ORR.  In each case where it appears that the sponsor and UAC may not have received adequate notice, we ask that the court rescind the removal order and either administratively close or terminate the proceedings or permit DHS an opportunity to perfect service of the NTA with accurate date and location information.  It would not suffice to grant motions to reopen liberally in these cases, as that would not provide a sufficient safeguard for these children.  Setting aside that many never would know to file such a motion or have the wherewithal to do so, many are eligible for relief, such as Special Immigrant Juvenile Status, that will not be available to them later.  Moreover, some inevitably will be removed without ever having the opportunity to file a motion.

2. We recommend that the court **work with DHS and ORR to institute procedures to ensure that UACs and other respondents consistently are provided accurate and timely notice of their hearings**.

3. Pending the implementation of reliable procedures for providing notice, we recommend that the court **continue granting continuances to non-appearing UACs and permit legal service providers to attempt to contact them**.

4. Where DHS seeks to proceed *in absentia*, we urge the court to **hold DHS to its burden of demonstrating notice by clear, unequivocal, and convincing evidence**.  As explained above, the "normal office procedures" for updating records and notifying respondents have broken down.  Thus, DHS should not be permitted to rely on a presumption of receipt of notice merely by showing that the notice was mailed to an address on file.  Instead, at a minimum, the court should ascertain the source of the address where notice was mailed and examine whether it matches the sponsor's address on file with ORR.[10]

---

[10]  The court also should scrutinize DHS's evidence to ensure it has complied with rules meant to protect children's rights and has carried its overall burden.  *See Woodby*, 385 U.S. at 285-86.  For example, the court should inspect the I-770 to ensure the child was given the required advisals.  *See Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993) (holding that removal proceeding is invalid where DHS fails to adhere to regulation promulgated to protect a fundamental right, even where regulation requires more protection than that required by statute); *see also Mejia-Andino*, 23 I&N Dec. at 537 (terminating proceedings for improper service of NTA).  The court should examine whether there are sufficient indicia of trustworthiness to render an I-213 reliable, including that the child was able to understand and relay the information contained therein free from undue influence.  *See Matter of Gomez-Gomez*, 23 I&N Dec. 522, 526 (BIA 2002) (en banc) (noting that government "would be well advised to include as many indicia of trustworthiness regarding the information in [the I-213] as are practicable, such as the source of the

We appreciate your taking the time to review our concerns and consider these recommendations. We would be grateful for the opportunity to discuss these issues with you at your earliest convenience and, to that end, will follow up with your office next week. To reach us before then, please contact Jordan Wells at jwells@nyclu.org or 212-607-3314.

Sincerely,

Donna Lieberman
Alexis Karteron
Aadhithi Padmanabhan
Jordan Wells

C:    Christopher Shanahan
New York Field Office Director
Immigration and Customs Enforcement
Department of Homeland Security
26 Federal Plaza
New York, NY 10278

David Fink
Federal Field Specialist Supervisor
Office of Refugee Resettlement
Administration for Children and Families
901 D Street, SW
ORR/8th Floor
Washington, DC 20447

---

information and the circumstances of the alien's apprehension"); *Mejia-Andino,* 23 I&N Dec. at 537 (Espenoza, J., concurring) (evidence obtained via undue influence should be excluded).